# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| JOHN W. JACKSON and SECOND AMENDMENT FOUNDATION, INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| -against- | ) ) ) | |
| GARY KING, in his Official Capacity as Attorney General of the State of New Mexico; and BILL HUBBARD, in his Official Capacity as Director of the Special Investigations Division of the New Mexico Department of Public Safety, | ) ) ) ) ) ) ) | Case No. 1:12-CV-421 |
| Defendants. | ) ) | |

## PLAINTIFFS' RESPONSE TO DEFENDANT BILL HUBBARD'S MOTION FOR SUMMARY JUDGMENT

NOW COME the Plaintiffs, JOHN W. JACKSON and SECOND AMENDMENT

FOUNDATION, INC., by and through undersigned counsel, and submit their Response to

Defendant BILL HUBBARD's F.R.Civ.P. 56 Motion for Summary Judgment.

Dated: February 14, 2013                    Respectfully submitted,

David G. Sigale, Esq. (#6238103 (IL))       Paul M. Kienzle, III., Esq. (#11521 (NE))
LAW FIRM OF DAVID G. SIGALE, P.C.            SCOTT & KIENZLE, P.A.
739 Roosevelt Road, Suite 304               P.O. Box 587
Glen Ellyn, IL 60137                        Albuquerque, NM 87103
630.452.4547                                (505) 246-8600
dsigale@sigalelaw.com                       paul@kienzlelaw.com
Admitted *pro hac vice*

                                  By: _____ /s/ David G. Sigale _____
                                              David G. Sigale

                                  One of the Attorneys for Plaintiffs

*TABLE OF CONTENTS*

Table of Authorities ……………………………………………………………..……… iii

Preliminary Statement ..................................................................................................... 1

Response to Defendant's Asserted Statement of Undisputed Facts .............................. 3

Additional Facts ……………………………………………………………………… 6

Argument ........................................................................................................................ 7

     I.     THE RIGHT TO THE PUBLIC CARRYING OF FIREARMS IS A
          FUNDAMENTAL CONSTITUTIONAL RIGHT AND IS AT ISSUE IN THIS
          CASE, TO BE ANALYZED UNDER NEAR STRICT SCRUTINY ………..…. 7

     II.    THE BAN ON CONCEALED CARRY FOR LAWFUL RESIDENT ALIENS
          SERVES NO GOVERNMENTAL INTEREST, AND IS NOT NARROWLY
          TAILORED AT ALL ……………….................................................................. 13

     III.   FEDERAL PREEMPTION OF IMMIGRATION PROHIBITS THE TYPE
          OF DISCRIMINATION AGAINST LAWFUL RESIDENT ALIENS AS
          EFFECTED BY THE CONCEALED CARRY BAN …………………………. 18

Conclusion ..................................................................................................................... 21

*TABLE OF AUTHORITIES*

<u>Cases</u>

*Arizona v. United States,*
       132 S. Ct. 2492 (2012) ……………………………………………………….. 19, 20

*Bateman v. Perdue,*
       2012 U.S. Dist. LEXIS 47336 (E.D.N.C. March 29, 2012) ……………………………….. 8

*Bernal v. Fainter,*
       467 U.S. 216 (1984) …………………………………………………………… 15

*Bridges v. Wixon,*
       326 U.S. 135 (1945) …………………………………………………………… 15

*Chapman v Gerard,*
       456 F.2d 577 (3rd Cir. 1972) ………………………………………………… 15

*District of Columbia v. Heller,*
       554 U.S. 570 (2008)...................................................................... 7, 8, 11, 12, 15

*Ezell v. City of Chicago,*
       651 F.3d 684 (7th Cir., 2011) ………………………………………………… 7

*Fletcher v. Haas,*
       851 F. Supp. 2d 287 (D. Mass. 2012) ………………………………………….. 10

*Graham v. Richardson,*
       403 U.S. 365 (1971) ……………………………………………….…………… 15

*Harisiades v. Shaughnessy,*
       342 U.S. 580, 588-589 (1952) …………………………………………………..19

*Hetherton v. Sears, Roebuck & Co.,*
       652 F.2d 1152 (3d Cir. Del. 1981) ...…………………………………………….. 11, 12

*Hines v. Davidowitz,*
       312 U.S. 52, 64 (1941) ……………………………………………………….. 19, 20

*McDonald v. City of Chicago,*
       130 S. Ct. 3020 (2010) ...................................................................... 7, 11, 12

*Moore v. Madigan,*
       702 F.3d 933 (7th Cir. 2012) ……………………………………………………. 7

iii

*Nyquist v. Mauclet*,
    432 U.S. 1 (1977) …………………………………………………………..... 15

*People v. Rappard*,
    28 Cal. App. 3d 302, 304 (Cal. App. 2d Dist. 1972) ……………………………  15, 16

*Pliego-Gonzalez v. City of Omaha*,
    8:11-CV-335 (D.Neb. November 21, 2011) …………………………………… 12

*Plyler v. Doe*,
    457 U.S. 202 (1982) ………………………………………………………… 15

*Raffaelli v. Committee of Bar Examiners*,
    496 P.2d 1264 (Cal. 1972) ………………………………………………… 16

*Russian Volunteer Fleet v. United States*,
    282 U.S. 481 (1931) ……………………………………………….................. 15

*State v. Chandler*,
    5. La. Ann. 489, 490 (1850) ………………………………………………… 13

*State v. Chumphol*,
    97 Nev. 440 (Nev. 1981) …………………………………………………… 16

*State v. McAdams*,
    714 P.2d 1236 (Wy. 1986) ………………………………………………..  11

*State ex rel. N.M. Voices for Children, Inc. v. Denko*,
    135 N.M. 439 (N.M. 2004) …………………………………………………11, 12

*Sugarmann v. Dougall*,
    413 U.S. 634 (1973) ………………………………………………………..  17, 18

*Toll v. Moreno*,
    458 U.S. 1 (1982) …………………………………………………………… 19

*United States v. Carter*,
    669 F.3d 411 (4th Cir. 2012) …………………………………………………  8

*United States v. Carolene Products Co.*,
    304 U.S. 144 (1938) ………………………………………………................... 14

*United States v. Curtiss-Wright Export Corp.*,
    299 U.S. 304, 318 (1936) ……………………………………………………..  19

iv

*United States v. Masciandaro,*
    638 F.3d 458 (4th Cir. 2011) …………………………………………………… 8, 9

*United States v. Rene E.,*
    583 F.3d 8 (1st Cir. 2009) ……………………………………………………… 8

*United States v. Verdugo-Urquidez,*
    494 U.S. 259 (1990) …………………………………………………................... 10

*United States v. Weaver,*
    2012 U.S. Dist. LEXIS 29613 (S.D.W.V., March 7, 2012) …………………………… 8

*Wong Wing v. United States,*
    163 U.S. 228 (1896) …………………………………………………….................15

*Woollard v. Gallagher,*
    2012 U.S. Dist. LEXIS 28498 (D.Md, March 2, 2012) ……………………………… 7, 9

*Yick Wo v. Hopkins,*
    118 U.S. 356 (1886) ……………………………………………………...………  20

Constitutional Provisions

U.S. Const., Art. I, § 8, cl. 4 ……………………………………………………..  19

U.S. Const., Art. VI, cl. 2 ………………………………………………………..  19

U.S. Const. amend. II .................................................................................................. *passim*

U.S. Const. amend. XIV………………………………………………………… *passim*

Statutes, Rules, and Ordinances

New Mexico Statute Annotated § 29-19-4.A(1)……………………………..….. *passim*

New Mexico Statute Annotated § 29-19-4.A.(10) …………………………….............. 14

New Mexico Statute Annotated § 29-19-5.B.(3) …………………………………… 14

New Mexico Statute Annotated § 29-19-5.D ……………………………..…………… 14

<u>Other Authorities</u>

T. Alexander Aleinikoff, *Semblances of Sovereignty: The Constitution, the State, and American Citizenship* 173 (2002) ……………………………………………………………….. 10

Gerald M. Rosberg, *The Protection of Aliens from Discriminatory Treatment by the National Government*, 1977 Sup. Ct. Rev. 275, 337 (1978) …………………………………………10

S. Legomsky & C. Rodriguez, *Immigration and Refugee Law and Policy* 115-132 (5th ed. 2009) ……………………………………………………………………... 19

*Arizona v. United States*¸ Brief for Argentina et al. as *Amici Curiae* ………………………….. 19

## *PRELIMINARY STATEMENT*

Hubbard's Motion for Summary Judgment starts with the premise that New Mexico's law discriminates against lawful resident aliens, a protected class.  The Motion, therefore, is an attempt to explain why the discriminatory law nonetheless meets constitutional scrutiny.  He argues incorrectly that there is no constitutional issue present, and even if there is the restriction somehow meets constitutional standards.  However, in large part Hubbard's Motion is just a rehash of the same baseless arguments made during the briefing and argument of Plaintiffs' pending Motion for Preliminary Injunction.  The Affidavit does not change the legal certainty that the State's law unconstitutionally discriminates against legal resident aliens, a suspect class, which alone makes the challenged statute subject to strict scrutiny.  Worse, the discrimination infringes on the Plaintiffs' fundamental Second Amendment rights to self-defense.

Hubbard seems to be making a bureaucratic argument that would in no way serve as a justification for discrimination, and in no way salvages the statute, as the alleged difficulties with finding out about criminal acts committed outside the country also applies to traveling citizens, so the same apparent lack of concern as to citizens should also be applied to Plaintiffs.  Further, New Mexico allows open carry by lawful resident aliens, so the alleged concern is far too hollow to meet constitutional muster.

Defendant then argues Plaintiffs are not entitled to equal protection of the law at issue, wrongly arguing that the prohibition at issue does not implicate the Second Amendment, and then incorrectly asks the Court to use the rational basis test to analyze Plaintiffs' Fourteenth Amendment Equal Protection claim.[1]

---

[1] *See* Hubbard's Motion at p.4: ". . . the Act is a reasonable restrictive means of regulating . . . ." Reasonable relation is a ration basis argument.

1

In fact, the Second Amendment is impacted by the State's prohibition.  This is not just Plaintiffs' argument, but Defendants' as well, though as previously noted the Defendants have chosen to make the argument in other jurisdictions.  Further, the Plaintiffs as permanent resident aliens a "suspect class" for Equal Protection purposes, and for both reasons the Defendants' prohibition must meet the burden of strict scrutiny, which it cannot do.  Defendants cannot even show a rational basis for its ban, though the actual standard is much higher.

Finally, the Defendant argues the law does not infringe on federal preemption of immigration law, but in denying a class of citizen to right to a prevalent form of self-defense in the State, that is exactly what New Mexico is doing.  Hubbard attempts to frame the argument in the context of laws regarding concealed carry, but the real context is that of the protection of the rights and safety of immigrants.  New Mexico's concealed carry ban as to lawful resident aliens negatively impacts both of these Congressional objectives.

When the Plaintiffs brought their pending Motion for Preliminary Injunction, the parties agreed there were no factual disputes in the matter, only legal arguments.  Hubbard filing a Motion for Summary Judgment does not change that truth.  Hubbard's Affidavit still does nothing to address why lawful resident aliens are trusted to openly carry firearms in public, but somehow are deemed untrustworthy when it comes to concealed carry permits.  Hubbard's Affidavit ignores how citizens committing disqualifying crimes while traveling overseas would (according to Hubbard) also slip through the background check net, yet lawful resident aliens are the only ones to suffer the indignity of constitutional deprivations.  The Supreme Court's Equal Protection jurisprudence as to lawful aliens has been to prevent wrongs such as in this case.  The Defendants know that the public carrying of firearms for self-defense is a fundamental right.

Having chosen to permit both the open and concealed carry of firearms in New Mexico, the State cannot deprive a protected class of its residents of the same benefits of the laws as everyone else.

Therefore, Defendant's Motion for Summary Judgment should be denied.

### *RESPONSE TO DEFENDANT'S ASSERTED STATEMENT OF UNDISPUTED FACTS*

1.      If Plaintiff Jackson applied for a concealed carry permit (a permit), it would be denied on the basis of his non-U.S. citizenship. *See* Joint Status Report, Document 13, Filed 6/8/12.

**RESPONSE:**        Admit.


2.      If a resident alien member, non-resident alien member or illegal alien member of the Second Amendment Foundation, Inc. who being otherwise qualified applied for a permit, it would be denied on the basis of his or her citizenship. *See Id.*

**RESPONSE:**        Admit.


3.      Defendant Hubbard is the Director of the Special Investigations Division of the New Mexico Department of Public Safety. In Defendant Hubbard's official capacity, he is responsible for enforcing certain of New Mexico's laws, customs, practices and policies specifically including NMSA 1978, § 29-19-4(A)(1) of the New Mexico Concealed Handgun Carry Act. *See Id.*

**RESPONSE:**        Admit.

4.      Defendant Hubbard is the authority charged with processing permit applications and issuing permits for handguns to residents of New Mexico. *See* Affidavit of Bill Hubbard, attached hereto.

**<u>RESPONSE:</u>**          Admit.

5.      Applicants who have any misdemeanor offense involving a crime of violence within the last ten years may not receive a permit under NMSA 1978, §29-9-4(B)(1).

**<u>RESPONSE:</u>**          Plaintiffs state the cited statute speaks for itself.

6.      Applicants who have been convicted of an offense involving the possession or abuse of controlled substances within the last 10 years may not receive a permit under NMSA 1978, §29-19-4(B)(3).

**<u>RESPONSE:</u>**          Plaintiffs state the cited statute speaks for itself.

7.      Applicants who have ever been convicted of a misdemeanor offense involving assault, battery or assault against a household member may not receive a permit pursuant to NMSA 1978, §29-19-4(B)(4).

**<u>RESPONSE:</u>**          Plaintiffs state the cited statute speaks for itself.

8.      Defendant Hubbard, pursuant to the New Mexico Concealed Handgun Carry Act (NMSA 1978, §29-19-5), runs background checks on applicants for a permit. *See Id.*

**<u>RESPONSE:</u>**          Upon information and belief, admit, though Plaintiffs have insufficient information to know whether Defendant Hubbard actually runs the background checks himself.

9.      Defendant Hubbard's background check of applicants is run through two national

databases; the National Instant Crime Background System (NICS) and the National Crime

Information Computer (NCIC). *See Id*.

**RESPONSE:**          Upon information and belief, admit.


10.     NICS and NCIC only show information about crimes that took place in the United

States. *See Id*.

**RESPONSE:**           Deny.  The NCIC database contains 21 files, including the Foreign

Fugitive File, which contains: "Records on persons wanted by another country for a crime that

would be a felony if it were committed in the United States."  The NCIC database also contains

the Immigration Violator File, which contains: "Records on criminal aliens whom immigration

authorities have deported and aliens with outstanding administrative warrants of removal."  *See*

http://www.fbi.gov/about-us/cjis/ncic/ncic_files.


11.     There is no database which shows foreign convictions. *See Id.*

**RESPONSE:**           Deny.  The NCIC database contains 21 files, including the Foreign

Fugitive File, which contains: "Records on persons wanted by another country for a crime that

would be a felony if it were committed in the United States."  The NCIC database also contains

the Immigration Violator File, which contains: "Records on criminal aliens whom immigration

authorities have deported and aliens with outstanding administrative warrants of removal."  *See*

http://www.fbi.gov/about-us/cjis/ncic/ncic_files.

12.     There is no way to run a background check on an individual for the time prior to that person living in the United States. *See Id*.

**<u>RESPONSE:</u>**     Deny.  The NCIC database contains 21 files, including the Foreign Fugitive File, which contains: "Records on persons wanted by another country for a crime that would be a felony if it were committed in the United States."  The NCIC database also contains the Immigration Violator File, which contains: "Records on criminal aliens whom immigration authorities have deported and aliens with outstanding administrative warrants of removal."  *See* http://www.fbi.gov/about-us/cjis/ncic/ncic_files.

### *ADDITIONAL FACTS*

13.     JACKSON has been a permanent resident alien of the United States since on or about November, 2008.  He has lived in New Mexico since arriving in the United States in February, 2007 on a K3 spousal visa.  JACKSON is concerned about his ability to defend himself in the event violence is inflicted upon him.  *See* Declaration of John W. Jackson, attached hereto as Exhibit "A."

14.     Except for the citizenship requirement, JACKSON is otherwise qualified to obtain a concealed carry permit in New Mexico.  *Id.*

15.     SAF is a non-profit membership organization incorporated under the laws of Washington with its principal place of business in Bellevue, Washington.  SAF's membership includes lawfully admitted aliens residing in New Mexico.  SAF has over 650,000 members and supporters nationwide, including more than 3000 in the State of New Mexico.  The purposes of SAF include education, research, publishing and legal action focusing on the Constitutional right privately to own and possess firearms.  SAF litigates this action on behalf of itself and its members, and as such has organizational standing to pursue this action and Motion.  *See*

6

Declaration of Julianne H. Versnel, Director of Operations of SAF, attached hereto as Exhibit

"B."

## *ARGUMENT*

I.    THE RIGHT TO THE PUBLIC CARRYING OF FIREARMS IS A FUNDAMENTAL
      CONSTITUTIONAL RIGHT AND IS AT ISSUE IN THIS CASE, TO BE ANALYZED
      UNDER NEAR STRICT SCRUTINY.

". . . [A] severe burden on the core Second Amendment right of armed self-defense will

require an extremely strong public-interest justification and a close fit between the government's

means and its end." *Ezell v. City of Chicago*, 651 F.3d 684, 708 (7th Cir. 2011).  Defendants

argue there is no Second Amendment right at stake, but the rulings of other Courts, as well as

Defendants' own arguments in other forums, show the Second Amendment applies to this case,

and therefore near strict scrutiny applies to the State's actions.

*District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. City of Chicago*,

130 S.Ct. 3020 (2010), altered the legal landscape as to Second Amendment analysis, and in

many instances the viability, of Second Amendment claims.  That alteration is becoming evident

throughout the Court system, including as to permanent resident aliens.

In 2012, at least five federal Courts have held that there is a constitutional right to the

public carrying of firearms.  The Seventh Circuit recently ruled in *Moore v. Madigan¸* 702 F.3d

933 (7th Cir. 2012), that an Illinois ban on the public carrying of firearms is unconstitutional, as

the Second Amendment right of bearing arms for self-defense extends outside of the home.

Further, District Courts across the country have specifically held that the Second

Amendment confers rights that extend beyond the home.  *See Woollard v. Gallagher*, 2012 U.S.

Dist. LEXIS 28498 (D.Md, March 2, 2012) (striking down Md. Public Safety Code § 5-

306(a)(5)(ii), requiring "good and substantial reason" to carry concealed handgun); *See also*

*United States v. Weaver*, 2012 U.S. Dist. LEXIS 29613 (S.D.W.V., March 7, 2012); *See also*

*Bateman v. Perdue*, 2012 U.S. Dist. LEXIS 47336, at \*10-\*11 (E.D.N.C. March 29, 2012)

("Although considerable uncertainty exists regarding the scope of the Second Amendment right

to keep and bear arms, it undoubtedly is not limited to the confines of the home." (striking down

North Carolina's prohibition on the carrying of handguns during declared state emergencies)).

The Supreme Court "read the [Second Amendment's] operative clause to 'guarantee the

individual right to possess *and carry* weapons in case of confrontation.'" *United States v. Rene

E.*, 583 F.3d 8, 11 (1st Cir. 2009) (quoting *District of Columbia v. Heller*, 554 U.S. at 592 (italics

added)). *See also Weaver*, 2012 U.S. Dist. LEXIS 29613 at \*13 (citing *United States v. Carter*,

669 F.3d 411, 415 (4th Cir. 2012) (recognizing *Heller*'s notation that the right to keep and bear

arms was understood by the founding generation to encompass "self defense and hunting" as

well as militia service); also citing *Heller*, 554 U.S. at 594 (stating that, by the time of the

founding, the right to have arms was "fundamental" and "understood to be an individual right

protecting against both public and private violence.")). The *Heller* Court additionally mentioned

militia membership and hunting as key purposes for the existence of the right to keep and bear

arms. See *Heller*, 554 U.S. at 598; *See also United States v. Masciandaro*, 638 F.3d 458, 467-68

(4th Cir. 2011), *cert. den.*, 132 S.Ct. 756 (U.S. Nov. 28, 2011) (Niemeyer, J., writing separately

as to Part III.B.).

The *Weaver* Court found entirely persuasive Judge Niemeyer's dissent on *Masciandaro*,

particularly for its analysis of the broader holdings of *Heller*, and agreed and adopted Judge

Niemeyer's conclusion that "the general preexisting right to keep and bear arms for participation

in militias, for self-defense, and for hunting is thus not strictly limited to the home environment

but extends in some form to wherever those activities or needs occur . . ." *Weaver*, 2012 U.S.

Dist. LEXIS 29613 at *13 (citing *Masciandaro*, 638 F.3d at 468 (Niemeyer, J., writing separately as to Part III.B.)).

The Defendants agree with these decisions, as the State is currently an *amicus* **supporting** Plaintiff SAF in the Fourth Circuit in the appeal of *Woollard v. Gallagher* (*See BRIEF OF THE COMMONWEALTH OF VIRGINIA AND THE STATES OF ALABAMA, ARKANSAS, FLORIDA, KANSAS, MAINE, MICHIGAN, NEBRASKA, NEW MEXICO, OKLAHOMA, SOUTH CAROLINA, SOUTH DAKOTA, WEST VIRGINIA, AND THE COMMONWEALTH OF KENTUCKY AS AMICUS CURIAE IN SUPPORT OF APPELLEES URGING AFFIRMANCE, Woollard v. Gallagher*, 12-1437 (". . . the amici States have an interest in this Court correctly holding that the self-defense interest animating the Second Amendment's individual right to keep and bear arms applies broadly beyond the confines of an individual's home."). In *Woollard*, the District Court struck down an impermissible "may issue" concealed-carry permitting scheme which allowed governmental officials to arbitrarily decide whether an concealed carry permit applicant "needed" the permit and giving authority to deny the permit on that basis. The State, as *amicus*, argued: ". . . empirical research show[s] that right-to-carry laws do not result in criminal violence . . . ." *See* p.2 of *Woollard amicus* Brief, attached hereto as Exhibit "C."

In *Woollard*, New Mexico argues: "Maryland's claim is premised on a belief that runs contrary to our system of ordered liberty: that law-abiding citizens may not be trusted to bear arms in defense of themselves and that there is a presumption against their doing so." *See* p.9 of *Woollard amicus* Brief. The same principle applies here. Of course, the *amicus* Brief, and the *Woollard* case, only involve citizens, but since the Defendant concedes that resident aliens enjoy Second Amendment rights (since he has gone to lengths to list the ways Plaintiffs can possess

firearms), that is a distinction without a difference. Since the State argues so forcefully that concealed carry *is* a Second Amendment right in the Fourth Circuit, it should not be allowed to turn around and argue the opposite because it wishes to discriminate against a different group of law-abiding New Mexico residents.

Further, the Second Amendment was specifically held to apply to lawful resident aliens in *Fletcher v. Haas*, 851 F. Supp. 2d 287 (D. Mass. 2012), where the Court extended firearm possession rights to lawful resident aliens, holding:

> With this framework in mind, I find no justification for refusing to extend the Second Amendment to lawful permanent residents. They have necessarily "developed sufficient connection with this country to be considered part of [the] community." *Verdugo-Urquidez*, 494 U.S. at 265. Professor Rosberg has identified as "the traditional premise of the country's immigration policy—that resident aliens are virtually full-fledged members of the American community, sharing the burdens of membership as well as the benefits." Gerald M. Rosberg, *The Protection of Aliens from Discriminatory Treatment by the National Government*, 1977 Sup. Ct. Rev. 275, 337 (1978). And then-Professor Aleinikoff, a former General Counsel of the Immigration and Nationalization Service, observed a decade ago,
>
> "Permanently residing aliens live and function much like citizens. They hold jobs, attend churches, send their children to school, and pay taxes. Children they give birth to in the United States are American citizens. From this perspective, the fact that aliens are not required by law to apply for citizenship is not surprising; in day-to-day terms, permanently residing aliens and citizens are already largely indistinguishable."

*Fletcher*, 851 F. Supp. 2d at 301 (quoting T. Alexander Aleinikoff, *Semblances of Sovereignty: The Constitution, the State, and American Citizenship* 173 (2002)). Thus, the Court in *Fletcher* determined that the plaintiffs in that case, two lawful permanent resident aliens, were entitled to Second Amendment rights. *Fletcher*, 851 F. Supp. 2d at 301-02. This is in direct

contravention to Hubbard's argument that only economic rights are protected by the Fourteenth Amendment's Equal Protection clause.

This case is directly on point with the pre-*Heller* and pre-*McDonald* case of *Hetherton v. Sears, Roebuck & Co.*, 652 F.2d 1152 (3d Cir. Del. 1981). In *Hetherton*, the Court stated:

> The essence of Sears' argument is that the § 904 requirement of two freeholder witnesses to the sale of a deadly weapon bears no rational basis to Delaware's legitimate interest in having purchasers positively identified and in deterring ex-felons, such as Fullman, who are not permitted to purchase firearms in Delaware, from buying guns. Hetherton counters that, since Delaware can totally ban the sale of firearms, non-freeholders are not being deprived of a right. Further, he contends the two freeholder requirement is rational in that it results in a more burdensome procedure for the purchase of weapons.
>
> Hetherton's argument that Delaware has created no right to purchase firearms is misconceived. While it may be true that Delaware could ban the sale of all deadly weapons, it does not follow that the State, having abrogated its power to effect a total ban, can arbitrarily establish categories of persons who can or cannot buy the weapons. Clearly, Delaware could not limit the sale of firearms to men only or to members of certain religious groups. The question then is whether it is rational for Delaware to limit sales to persons who know two Delaware freeholders and can produce them as witnesses. We think that this question must be answered in the negative. *Hetherton*, 652 F.2d at 1157-1158.

Similarly, New Mexico argues it could prohibit concealed carry, but it does not. "We hold that Article II, Section 6 does not prohibit the carrying of concealed weapons, and the Act does not violate our Constitution." *State ex rel. N.M. Voices for Children, Inc. v. Denko*, 135 N.M. 439, 440 (N.M. 2004). "The Constitution neither forbids nor grants the right to bear arms in a concealed manner. Article II, Section 6 is a statement of neutrality, leaving it to the Legislature to decide whether, and how, to permit and regulate the carrying of concealed weapons." *Id.* at 441. However, the State must still regulate and permit in a constitutional manner. Discriminating against permanent resident aliens does not accomplish this.

11

This distinguishes this case from *State v. McAdams*, 714 P.2d 1236 (Wy. 1986), wherein the Court specifically stated the state could not ban all carrying but could regulate it to not include concealed carry. *Id.* at 1237. In contrast, New Mexico does not ban concealed carrying. This is by virtue of allowing all qualified citizens who complete the application process to obtain a concealed carry permit.[2] The only difference between the would-be applicant Plaintiffs and the actual applicants under the statute is that Plaintiffs are wrongfully disqualified due to citizenship status.

The Defendants' conduct is unacceptable under *Hetherton*, where a rational basis burden was employed, since there was no rational basis for denying the right to sell firearms to certain categories of people. However, this case is not about the sale of firearms, but the denial of the ability to carry concealed firearms for the core fundamental Second Amendment right of self-defense. Since *Hetherton*, the Supreme Court has spoken clearly about the fundamental nature of Second Amendment rights in *Heller* and *McDonald.*

Additionally, in 2011, the District of Nebraska held that denying a lawful permanent resident the ability to possess a handgun in his home violated his fundamental Second Amendment rights. *See Pliego-Gonzalez v. City of Omaha,* 8:11-CV-335 (D.Neb. November 21, 2011) (Order of Court attached hereto as Exhibit "D").

Of course, the State is allowed certain constitutional regulations of the right to carry arms, including the manner of carrying. The two obvious choices are concealed and open carrying. Virtually all states allow concealed carry. A few allow open carry. New Mexico allows both. *See State ex rel. N.M. Voices for Children, Inc. v. Denko*, 135 N.M. 439, 440 (N.M. 2004). As this is how the State legislature has chosen to regulate the manner of exercising the

---

[2] Defendants claim they have instituted a prohibition "with exceptions," but that is purely semantical when any citizen who applies and qualifies will receive a permit.

12

Second Amendment, that regulation must be applied in a constitutionally equal manner to its law-abiding citizens. Further, because the Defendants' prohibition implicates the Second Amendment, strict scrutiny must be applied in evaluating the statute's constitutionality.

The ban neither furthers a compelling State interest, nor is it the least-restrictive means to reach any such claimed interest. Therefore, the prohibition must be enjoined.

II.    THE BAN ON CONCEALED CARRY FOR LAWFUL RESIDENT ALIENS SERVES NO GOVERNMENTAL INTEREST, AND IS NOT NARROWLY TAILORED AT ALL.

Defendant argues there is no Fourteenth Amendment violation because there is no Second Amendment right at issue to violate. Since the Defendants have the Second Amendment argument wrong, the Fourteenth Amendment argument is likewise faulty.

While the Defendants concede that permanent resident aliens, such as Jackson and SAF's applicable members, are generally entitled to equal protection of the laws under the Fourteenth Amendment, they argue Plaintiffs are not entitled to equal protection of the law at issue. They make vague references to police power and protecting the public. But these alleged justifications are not supported by any actual evidence or proof; indeed, it is impossible to justify why permanent resident aliens may carry firearms in their home, on their property, in their vehicle, and openly in public, but why banning them from carrying concealed furthers public safety. Defendants do not even try, claiming that " . . . at the core of the police power is the ability to protect the public from concealed carry of firearms because of the inherent danger that unregulated concealed weapons pose to the public." *See* p.9 of Hubbard's Motion (citing *State v. Chandler*, 5. La. Ann. 489, 490 (1850)). The argument is outdated in 2013, in a State that protects Second Amendment rights and the equal rights of its residents. New Mexico has decided since 2004 that citizens may carry concealed firearms, and not unregulated. The bearer

must obtain a concealed carry license pursuant to NMSA § 29-19-4., and comply with all requirements therein, including completing a firearms training course (*See* NMSA § 29-19-4.A.(10)).  The applicant must be fingerprinted and pass a national criminal background check. *See* NMSA § 29-19-5.B.(3); 5.D.

In contrast, it is the open carry of firearms that the legislature has allowed to be unregulated, including for permanent resident aliens.  Therefore, whatever vague police power or public safety interest the Defendants are claiming in denying Plaintiffs equal protection, it is disingenuous when the State obviously allows permanent resident aliens all the other types of firearms carrying without police power or public safety concerns.  The Defendants offer no reason why permanent resident aliens residing in New Mexico, who are trustworthy to carry firearms in their home, vehicle, on their property, and openly in public places, are a danger to society if allowed to carry concealed.  Hubbard's Affidavit addresses none of this, nor why citizens who travel abroad are not denied concealed carry permits, since hypothetically they could commit crimes that would slip through a background check.  That New Mexico does not deny or revoke permits of international travelers shows that this concern is not as important as Defendant would have the Court believe.  When Defendant argues that the "international traveler" scenario is speculative and remote, Plaintiffs point out that so is the lawful permanent resident scenario.  The only difference is that the lawful aliens are actually suffering discrimination as a result of this pretense.

Further, the statute must be reviewed under strict scrutiny because of the State's discrimination against a suspect class.  ". . . [C]lassifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny. Aliens as a class are a prime example of a 'discrete and insular' minority (*see United States v. Carolene*

14

*Products Co.*, 304 U.S. 144, 152-153, n. 4 (1938)) for whom such heightened judicial solicitude is appropriate." *Graham v. Richardson*, 403 U.S. 365, 372 (1971).  *See also Nyquist v. Mauclet*, 432 U.S. 1 (1977) (discrimination against aliens in state financial assistance for higher education violated failed to meet strict scrutiny burden of Equal Protection Clause).

Defendant argues that equal protection to legal aliens extends only to economic rights, but that is clearly revealed to be false by the case law.  In *Bernal v. Fainter*, 467 U.S. 216 (1984), a citizenship requirement to be a notary public in Texas was struck down.  Though the Court described a "political function" exception to the alienage strict scrutiny requirement, that was found to apply only to ". . . to laws that exclude aliens from positions intimately related to the process of democratic self-government." *Id.* at 220.  Of course, *Bernal* was a pre-*Heller* decision.  The bearing of firearms, as important a right as it is, does not fall into the democratic process category.  Strict scrutiny still applies in this case, which Defendant cannot overcome.

Violations of equal protection based on alienage has resulted in the striking down laws in many constitutional the areas (*See Nyquist*, 432 U.S. 1 (1977) (education); *See also Plyler v. Doe*, 457 U.S. 202 (1982) (education), *Chapman v Gerard*, 456 F.2d 577 (3rd Cir. 1972) (education); *Bridges v. Wixon*, 326 U.S. 135, 148 (1945) (resident aliens have First Amendment rights); *Russian Volunteer Fleet v. United States*, 282 U.S. 481 (1931) (Just Compensation Clause of Fifth Amendment); *Wong Wing v. United States*, 163 U.S. 228, 238 (1896) (resident aliens entitled to Fifth and Sixth Amendment rights)).

Additionally, though the case law extends well beyond economic rights, despite Defendants' argument to the contrary, Courts have specifically applied the Fourteenth Amendment's Equal Protection Clause to aliens in the context of firearms.  Aliens are considered a suspect class, as noted, for example, in *People v. Rappard*, 28 Cal. App. 3d 302, 304 (Cal. App.

15

2d Dist. 1972).  In *Rappard*, an alien was convicted of being in possession of a concealable firearm.  He successfully challenged his conviction under the Equal Protection Clause.  The Court held: "Since classifications based upon alienage, like those predicated upon nationality or race, are inherently suspect and subject to close judicial scrutiny, we must invoke the following strict standard when reviewing a discriminatory statute based upon alienage: 'Not only must the classification reasonably relate to the purposes of the law, but also the state must bear the burden of establishing that the classification constitutes a necessary means of accomplishing a legitimate state interest, and that the law serves to promote a compelling state interest.'"  *Rappard*, 28 Cal. App. 3d  at 304.

In striking down the law at issue, the Court wrote:  "In short, the classification of the statute -- alienage -- has no reasonable relationship to the threat to public safety which Penal Code section 12021 was ostensibly designed to prevent. Any classification which treats all aliens as dangerous and all United States citizens as trustworthy rests upon a very questionable basis." *Id.* at 305.  While *Rappard* may not bind this Court, it is instructive in its similarities.

A similar result was reached in *State v. Chumphol*, 97 Nev. 440 (Nev. 1981), where the Court stated: "A person does not exhibit a tendency toward crime merely because he or she is a noncitizen. *See Raffaelli v. Committee of Bar Examiners*, 496 P.2d 1264 (Cal. 1972). As the California Supreme Court noted in that case, classification based upon alienage 'is the lingering vestige of a xenophobic attitude which . . . should now be allowed to join those [other] anachronistic classifications among the crumbled pedestals of history.'" *Id.* at 442.

Defendants argue that since they are able to ban concealed carry, they also have the right to grant it to some (citizen-residents) but not others (permanent resident aliens).  If the "others" in Defendants' argument included the mentally ill, violent felons, or illegal aliens (the rights of

none of these being at issue in this case), Defendants' argument may hold water.  But the "others" in this case, who Defendants so cavalierly dismiss, are law-abiding residents entitled to constitutional rights, *including* the Fourteenth Amendment's guarantee of equal protection of the laws.  While the State may have the prerogative to try and repeal concealed carry through the political process, it may not enact it and then ban it as to a group of law-abiding residents without reason or rationale.

Indeed, there is no legitimate justification even offered for this discrimination, not one under rational basis, and certainly not one under strict scrutiny.  No logical rationale can even be offered, because: (1.) permanent resident aliens seeking a concealed carry permit would still have to successfully complete and qualify under the statutory application process, and (2.) the State considers permanent resident aliens trustworthy enough to possess and carry firearms in many other contexts.  Defendant Hubbard's concerns apply equally to citizens and lawful resident aliens, and are no basis for discrimination.

Plaintiffs testified in their Declarations they do not wish to always carry firearms openly, and it is obvious that there are situations where someone may wish to have a firearm for protection, yet not advertise that fact.  Further, Plaintiffs testify they refrain from carrying concealed due to fear of criminal penalties.  They have shown that are suffering discrimination under the law, and that there is no constitutional basis for doing so.  Neither Hubbard's Affidavit, nor his alleged justifications for the discrimination, change that conclusion.

The case of *Sugarmann v. Dougall*, 413 U.S. 634 (1973), cited by Defendant, does not support his position at all, and instead supports the legal propositions Plaintiffs are claiming.  In *Sugarmann*, plaintiffs challenged a New York City ban on federally-registered resident aliens working in competitive civil service positions.  The Court struck the ban down, in part because:

> It is at once apparent, however, that appellants' asserted justification proves both too much and too little. As the above outline of the New York scheme reveals, the State's broad prohibition of the employment of aliens applies to many positions with respect to which the State's proffered justification has little, if any, relationship. At the same time, the prohibition has no application at all to positions that would seem naturally to fall within the State's asserted purpose. Our standard of review of statutes that treat aliens differently from citizens requires a greater degree of precision. *Id.* at 642.

This fits the current situation directly, where one type of firearm possession is banned to aliens while others are open, and with no offered compelling interest as to why. The State argues it may ban concealed carry altogether, which means it may restrict it to whomever it wants, but this is not true either. The Supreme Court " . . . has rejected the concept that constitutional rights turn upon whether a governmental benefit is characterized as a 'right' or as a 'privilege.'" *Id.* at 644. At most, Defendants can cite *Sugarmann* for the proposition that certain hypothetical state restrictions regarding constitutional functions such as voting and holding high office may meet strict scrutiny, but that is a far cry from the instant situation, and completely inapposite.

Therefore, because the State has chosen to regulate the Second Amendment right of the public carrying of firearms by enacting regulatory schemes of unpermitted open carrying and permitted concealed carrying, the State may not deny this right to certain classes of residents entitled to this constitutional right, such as lawful permanent residents. For this additional reason, Defendant's Motion for Summary Judgment must be denied.

III.  **FEDERAL PREEMPTION OF IMMIGRATION PROHIBITS THE TYPE OF DISCRIMINATION AGAINST LAWFUL RESIDENT ALIENS AS EFFECTED BY THE CONCEALED CARRY BAN.**

"The Supremacy Clause provides a clear rule that federal law 'shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution

or Laws of any State to the Contrary notwithstanding.'" *Arizona v. United States*, 132 S. Ct. 2492, 2500 (2012) (quoting U.S. Const. Art. VI, cl. 2).

"The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens. *See Toll v. Moreno*, 458 U.S. 1, 10 (1982); *see generally* S. Legomsky & C. Rodriguez, Immigration and Refugee Law and Policy 115-132 (5th ed. 2009). This authority rests, in part, on the National Government's constitutional power to "establish an uniform Rule of Naturalization," U.S. Const., Art. I, § 8, cl. 4, and its inherent power as sovereign to control and conduct relations with foreign nations, *see Toll, supra*, at 10 (citing *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 318 (1936)).

The federal power to determine immigration policy is well settled. Immigration policy can affect trade, investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of aliens in this country who seek the full protection of its laws. *See, e.g.*, Brief for Argentina et al. as *Amici Curiae*; *see also Harisiades v. Shaughnessy*, 342 U.S. 580, 588-589 (1952). Perceived mistreatment of aliens in the United States may lead to harmful reciprocal treatment of American citizens abroad." *Arizona v. United States*, 132 S. Ct. at 2498.

"It is fundamental that foreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate States." *Arizona v. United States*, 132 S. Ct. at 2498. "This [Supreme] Court has reaffirmed that '[o]ne of the most important and delicate of all international relationships . . . has to do with the protection of the just rights of a country's own nationals when those nationals are in another country.'" *Id.* at 2498-99 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 64 (1941)).

19

"Numerous treaties, in return for reciprocal promises from other governments, have pledged the solemn obligation of this nation to the end that aliens residing in our territory shall not be singled out for the imposition of discriminatory burdens. Our Constitution and our Civil Rights Act have guaranteed to aliens 'the equal protection of the laws [which] is a pledge of the protection of equal laws.'" *Hines*, 312 U.S. at 69 (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886)).

Put simply, the concealed carry ban is pre-empted by federal immigration law, not because federal law has a national concealed carry policy, which it does not, but discriminating against lawful resident aliens in such a way that puts them in physical danger violates the governmental objectives of ensuring safety, security, and equal protection for said aliens.

Hubbard did not offer any facts in his Motion, nor in his Affidavit, regarding this issue; he simply offered incorrect arguments about congressional intent.  However, the Supreme Court recently made its view of governmental objectives in the immigration field very clear in the *Arizona* case, one of which is the protection of the rights of foreign nationals while they are in this country.  New Mexico therefore does not have the right to single out lawful resident aliens for discriminatory treatment.  Since Hubbard has the burden of showing no genuine issue of material fact, and Hubbard has not offered anything, his Motion as to Plaintiffs' Count III should be denied.

## CONCLUSION

Wherefore, Plaintiffs respectfully request that Defendant Bill Hubbard's Motion for

Summary Judgment be denied in its entirety.


Dated: February 14, 2013                            Respectfully submitted,

David G. Sigale, Esq. (#6238103 (IL))              Paul M. Kienzle, III., Esq. (#7592 (NM))
LAW FIRM OF DAVID G. SIGALE, P.C.                  SCOTT & KIENZLE, P.A.
739 Roosevelt Road, Suite 304                       P.O. Box 587
Glen Ellyn, IL 60137                                Albuquerque, NM 87103
630.452.4547                                        (505) 246-8600
dsigale@sigalelaw.com                               paul@kienzlelaw.com
Admitted *pro hac vice*


                                                    By:          /s/ David G. Sigale
                                                                 David G. Sigale

                                                    One of the Attorneys for Plaintiffs



## CERTIFICATE OF ATTORNEY AND NOTICE OF ELECTRONIC FILING

The undersigned certifies that:

1.      On February 14, 2013, the foregoing document was electronically filed with the
District Court Clerk *via* CM/ECF filing system;

2.      Pursuant to F.R.Civ.P. 5, the undersigned certifies that, to his best information
and belief, there are no non-CM/ECF participants in this matter.



                                                         /s/ David G. Sigale
                                                    One of the Attorneys for Plaintiffs